UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

SAMANTHA RANDALL, o/b/o D.M.,      )
                                   )
            Plaintiff,             )
                                   )
      v.                           ) No. 4:10CV79 FRB
                                   )
MICHAEL J. ASTRUE, Commissioner    )
of Social Security,                )
                                   )
            Defendant.             )

**MEMORANDUM AND ORDER**

      This cause is before the Court on appeal of an adverse
ruling of the Social Security Administration.   All matters are
pending before the undersigned United States Magistrate Judge, with
consent of the parties, pursuant to 28 U.S.C. § 636(c).

**I.  Procedural History**

      On August 7, 2007, plaintiff Samantha Randall filed an
application for Supplemental Security Income pursuant to Title XVI,
42 U.S.C. §§ 1381, et seq., on behalf of her minor child, D.M., in
which she claimed that D.M. has been disabled since birth, that is,
since September 2, 1997.  (Tr. 79-81.)  On initial consideration,
the Social Security Administration denied plaintiff's claim for
benefits.  (Tr. 49, 50-54.)  On April 21, 2009, a hearing was held
before an Administrative Law Judge (ALJ).  (Tr. 29-48.)  Plaintiff
and D.M. testified and were represented by counsel.  On May 22,
2009, the ALJ issued a decision denying plaintiff's claim for
benefits.  (Tr. 14-28.)  On November 13, 2009, after review of

additional evidence, the Appeals Council denied plaintiff's request for review of the ALJ's decision. (Tr. 1-5.) The ALJ's decision is thus the final decision of the Commissioner. 42 U.S.C. § 405(g).

## II.  Evidence Before the ALJ

A.  <u>Plaintiff's Testimony</u>

At the hearing on April 21, 2009, plaintiff testified in response to questions posed by the ALJ and counsel. At the time of the hearing, plaintiff testified that D.M. was eleven years of age and in the fifth grade. Plaintiff has two younger children. Plaintiff testified that D.M. stands five-feet, two inches tall and weighs approximately 130 pounds. Plaintiff testified that D.M. suffers from behavioral impairments. Although plaintiff testified that D.M. had not been diagnosed with any major physical problems, she also testified that she had been told at D.M.'s last eye examination that he was legally blind. D.M. wears glasses. (Tr. 32-33.)

Plaintiff testified that D.M. was diagnosed with attention deficit hyperactivity disorder (ADHD) and Asperger's Syndrome, a form of autism. Plaintiff testified that D.M. had a speech impediment when he was younger, but that it has since improved. (Tr. 34.) Plaintiff testified, however, that D.M. continues to slur his words when he is half-way through long sentences, making it difficult to understand him. (Tr. 35.)

With respect to D.M.'s ADHD, plaintiff testified that D.M. focuses better and sits still when he takes his medication. Plaintiff testified, however, that, even with medication, D.M. takes hours to complete simple chores, withdraws, and does anything other than what he is supposed to do if there is even the slightest distraction. Plaintiff testified that she has tried to motivate D.M. to complete the tasks he is assigned to do, but that he continues to do nothing. (Tr. 35-36.)

With respect to D.M.'s Asperger's Syndrome, plaintiff testified that D.M. has difficulty with social skills. Plaintiff testified that D.M. has one friend at school and is otherwise withdrawn from his peers. Plaintiff testified that D.M. has little difficulty communicating and socializing with children who are five or six years younger than him. Plaintiff testified that D.M. likes to hide from situations, and that one of D.M.'s teachers reported that D.M. sometimes wears his winter coat to class and holds it over his head in order to escape. Plaintiff testified that D.M. does not like to come out and "present himself" unless it is with a younger child or with an adult. Plaintiff testified that while her other children have friends and enjoy doing various activities, D.M. has no interest in doing anything that involves activity and would rather sit aside and read or play with his cars. (Tr. 36-37.)

Plaintiff testified that D.M. goes to church on Sundays

and sometimes goes to the church on other days when the church bus comes to the house to pick him up. Plaintiff testified that D.M. has shown an interest in soccer and that she was going to try to get him involved in the sport. Plaintiff also testified that she was researching specialized camps for autistic children so that D.M. could be with children his age who experience the same difficulties. (Tr. 45.)

Plaintiff testified that D.M. has trouble with bedwetting issues, although the occurrences have become less frequent -- happening only three or four times a week instead of every night. Plaintiff testified that she has tried various strategies with the issue, but has been unsuccessful. (Tr. 37.) Plaintiff testified that D.M. has difficulty buttoning his shirt and tying his shoes. Plaintiff testified to her belief that D.M. becomes confused during such activities and therefore does not perform such functions properly. (Tr. 37-38.) Plaintiff also testified to her belief that D.M. cannot handle money nor understands the concept of making change. (Tr. 38-39.)

With respect to D.M.'s performance in school, plaintiff testified that D.M. is on the A/B Honor Roll, but that he has also received D's and F's. Plaintiff testified that D.M. loses his books, is never prepared for class, and frequently forgets assignments or to take his materials to school. (Tr. 39-40.) Plaintiff testified that D.M.'s teachers report that D.M. whines a

lot, plays on the computer or with paper when he is supposed to be engaged in other things, and that he needs a lot of extra help with organization and reminders to stay on task. Plaintiff testified that she observes this same type of behavior at home on a daily basis. (Tr. 40.) Plaintiff testified that she went to school on many occasions to observe D.M. in the classroom so that D.M. would be aware that he would have to answer for his actions when he got home. Plaintiff testified that after two weeks of her presence in the classroom, D.M. "started falling into line a little bit." (Tr. 41.) Plaintiff testified that D.M. has an Individual Education Plan (IEP) plan at school and that she hears from D.M.'s teachers regarding his problems. (Tr. 43.) Plaintiff testified that D.M. had an IEP plan at his school in Florida, and that she has had him tested since he was two years of age because of his known difficulties. (Tr. 44.)

Plaintiff testified that D.M. is a "great kid" and can settle into a routine after a while. Plaintiff testified that if something disrupts the routine, D.M.'s behavior becomes problematic. (Tr. 41-42.) Plaintiff testified that D.M. has a lot of outbursts and does not have an understanding as to personal boundaries. Plaintiff testified that D.M. understands that, at school, you cannot hit someone, but that he had an in-school suspension for spitting on other students when he did not like their behavior. Plaintiff testified that D.M. does not understand

normal gestures, such as someone shaking their head "no," and does not understand limits put on him. (Tr. 42-43.)

Plaintiff testified that D.M. has medication for his condition and that she tries every day to make sure he takes it. Plaintiff testified that D.M. constantly complains about the medication. Plaintiff testified that, on one occasion, D.M. did not take his medication for about two weeks because it was misplaced. Plaintiff testified that after this two-week period, D.M. told her that he thought he needed to be taking his medication. (Tr. 45.)

B.   <u>Testimony of D.M.</u>

D.M. testified at the hearing in response to questions posed by the ALJ. D.M. testified that he can go outside for lunch at school but not recess, and that not being able to go outside for recess sometimes makes him mad. (Tr. 45-46.) D.M. testified that during lunch, some other kid will make him go to the end of the line or tell him to sit at another table. D.M. testified that when he is finished with his lunch, he will cover himself up with his coat until his friend tries to get him to come out. D.M. testified that he and his friend tell each other funny things and that his friend gives him Star Wars trading cards. D.M. testified that he is trying to convince his mom to let his friend come over. (Tr. 46.)

D.M. testified that he watches movies at home because his

mom took all of the books away. D.M. testified that he had pretty much nothing to read except for some library books, but that he has lost two of them. (Tr. 46-47.) D.M. testified that he no longer plays video games because one was taken away from him by his godmother, and the other one had missing or frayed wires. D.M. testified that he visited his grandmother during the previous summer and that she took him to a nearby creek, which he loved. D.M. testified that he cannot swim. (Tr. 47.)

### III. Medical, School and Other Records[1]

D.M. was enrolled in a program prior to kindergarten for children with disabilities. It was noted that D.M. was eligible for services relating to a speech impairment and an unspecified learning disability. (Tr. 183.)

On November 18, 2003, when he was six years of age, D.M. visited the Nemours Children's Clinic for follow up of the ophthalmologic conditions of accommodative esotropia and amblyopia. Compound hyperopic astigmatism was also noted. D.M. was provided a prescription for glasses and was instructed to wear them full time. With such glasses, D.M.'s visual acuity was measured to be

---

[1]Additional evidence which was not before the ALJ was submitted to and considered by the Appeals Council. This evidence consists of an undated script from family nurse practitioner Kelly Vago. (Tr. 351.) The Court must consider this record in determining whether the ALJ's decision was supported by substantial evidence. Frankl v. Shalala, 47 F.3d 935, 939 (8th Cir. 1995); Richmond v. Shalala, 23 F.3d 1441, 1444 (8th Cir. 1994). For the sake of continuity, discussion of this record is incorporated with that of the records before the ALJ at the time of his decision.

20/25 OD and 20/40 +1 OS. Plaintiff was instructed to return with D.M. in six to eight weeks for follow up, at which time patching would be considered. (Tr. 355-56.)

On April 29, 2004, D.M. visited Dr. Sahar Aboudan. D.M. was six years of age. It was noted that D.M.'s school reported symptoms of hyperactivity. Dr. Aboudan noted that D.M. had been in special education classes since he was two years of age. D.M.'s speech problems were noted. Dr. Aboudan questioned whether D.M. was mentally retarded. Upon examination, Dr. Aboudan diagnosed D.M. with Attention Deficit Hyperactivity Disorder (ADHD) and learning disabled. Ritalin[2] was prescribed. (Tr. 364.)

D.M. returned to Dr. Aboudan on June 1, 2004. Dr. Aboudan noted D.M. to be doing better on Ritalin. Plaintiff was encouraged to seek family counseling to help with ADHD management. D.M.'s prescription for Ritalin was refilled, and plaintiff was instructed to return with D.M. in one month. (Tr. 363.)

D.M. returned to Dr. Aboudan on August 18, 2004. It was noted that D.M. was responding to Ritalin but continued to be fidgety. Plaintiff was instructed to increase D.M.'s dosage of Ritalin and a new prescription was provided. (Tr. 362.)

D.M. returned to Dr. Aboudan for follow up on September 28, 2004. No new concerns regarding D.M.'s ADHD were noted.

---

[2]Ritalin is used as part of a treatment program to control symptoms of ADHD. <u>Medline Plus</u> (last revised Jan. 1, 2011) <<u>http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682188.html</u>>.

Plaintiff was instructed to continue D.M. on the prescribed dosage of Ritalin. (Tr. 361.)

On November 22, 2004, D.M. returned to Dr. Aboudan. Plaintiff reported that D.M.'s ADHD condition was not responding to Ritalin. Dr. Aboudan switched D.M.'s medication to Concerta.[3] (Tr. 360.)

D.M.'s Concerta prescription was refilled in February, April, and July 2005. (Tr. 358-59.)

In kindergarten and first grade, D.M. received grades of "satisfactory" in Reading and Math. In second grade, D.M. received A's in Reading, Language, Spelling, and Math; a B in Citizenship; and grades of "satisfactory" in the areas of Social Studies, Science and Health, Physical Education, Music, Art, and Writing. (Tr. 180.)

Rose Marie Green-Hanson completed a Teacher Questionnaire for disability determinations regarding her observations of D.M. during his first and second grades. Ms. Green-Hanson taught D.M. all subjects during such grades. Ms. Green-Hanson reported that D.M. received special education services the entire school day in a self-contained classroom. (Tr. 168.) Ms. Green-Hanson reported D.M. to have obvious problems in the area of Acquiring and Using

---

[3]Concerta is another brand name for methylphenidate, the medication marketed under the name Ritalin used as part of a treatment program to control symptoms of ADHD. See Medline Plus (last revised Jan. 1, 2011)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682188.html>.

Information.  Ms. Green-Hanson stated that D.M. was a sweet child but "could not stay focus[ed] on task except the assistance [sic] or myself was sitting with him. . . . [D.M.] had a hard time comprehending what he read, he would have to be prompted several times before he gives the required answer(s).  Academic subjects were a challenge for [D.M.]." (Tr. 169.)  Ms. Green-Hanson also reported D.M. to have problems, ranging from slight to very serious, in the area of Attending and Completing Tasks, with such problems occurring on a daily and/or hourly basis.  Ms. Green-Hanson stated that

> [D.M.] did not pay attention most of [the] time, except [when] the person was right up in his face and after several times of repeating the directions to [D.M.] before he seemed to understand what was being asked of him.  He could not carry out a multi-step direction nor change activities without a problem with his group or another classmate.

(Tr. 170.)

Ms. Green-Hanson reported D.M. to have slight to obvious problems in the area of Interacting and Relating with Others, with such problems occurring on a daily basis.  Ms. Green-Hanson stated that D.M. was able to adequately express himself with grammar, but had difficulty expressing himself in writing.  Ms. Green-Hanson stated that D.M. had a behavior modification page which allowed her as a teacher to implement disciplinary strategies if D.M.'s behavior became out of control.  (Tr. 171.)  Ms. Green-Hanson reported that

she could understand almost all of D.M.'s speech regardless of whether the topic was known or unknown. Ms. Green-Hanson reported that D.M. had no problems in the area of Moving About and Manipulating Objects. (Tr. 172.) In the area of Caring for Himself, Ms. Green-Hanson reported that D.M. had only some or slight problems in the area. Ms. Green-Hanson stated that D.M. cried a lot and rarely asked for help when he needed it. Ms. Green-Hanson stated that D.M. needed to be supervised constantly and be redirected to the task at hand. Ms. Green-Hanson also stated that D.M. "demonstrated behaviors which [were] below the age level of his peers." (Tr. 173.) Ms. Green-Hanson reported that she did not know whether D.M. took medication. (Tr. 174.) Ms. Green-Hanson summarized her observations of D.M. as follows:

> [D.M.] would make friends, but the friendship would not last for the day. He whined a lot and complain[ed] about everything. [D.M.] would have to be seated by an adult to get any work done in school. If left alone he would get up and walk[] around in a wandering manner. Move like out of space[. W]hen redirected to his seat he would make excuses and would have to be told again or an adult would have to physical[ly] lead him to his seat and use[] proximity control to keep him there.

(Tr. 175.) (Emphasis in original.)

In October 2006, while D.M. was in the third grade, the Duval County Public Schools in Jacksonville, Florida, prepared an Individual Education Plan (IEP) for D.M. which would apply in the

third and fourth grades. (Tr. 186-210.) The specific need identified in the IEP was for positive behavior intervention or strategies, and the domains within which such need was to be addressed were curriculum and learning, social/emotional behavior, and communication. (Tr. 187.) In the area of curriculum and learning, D.M.'s strength was noted to be his ability to express his thoughts and ideas orally in the classroom. D.M.'s weakness was noted to be his ineffective use of the writing process to develop a response to a story or prompt. (Tr. 188.) It was noted that D.M. read at grade level and enjoyed chapter books and sharing stories, but that he sometimes only gave partial summaries, incorrect responses, or no response at all when prompted. (Tr. 189.) With respect to math, D.M. was in the average range for performance, but had difficulty using math processes consistently. (Tr. 191.) In the area of social/ emotional behavior, it was noted that D.M. enjoyed sharing information in classroom discussions and was capable of producing grade level work, but that he had difficulty staying focused, socializing with peers, and completing his assignments. It was also noted that D.M. would get up and walk around the class during instruction and required redirection to get back on task. (Tr. 193.) Goals were made and strategies were identified in the IEP, with notations as to flexible accommodations for testing. It was determined that D.M. would be placed in a regular classroom for at least seventy-nine percent of the time,

with weekly speech/language therapy or instruction. (Tr. 199, 203.)

Between November 2006 and January 2007, D.M. underwent special education evaluation for the St. Clair R-XIII School District. D.M. was nine years of age and in the third grade. It was noted that D.M. had an IEP from Florida when he came to the school district in November 2006, but that the IEP was not accepted.[4]

As a part of this evaluation, D.M. was administered the Wechsler Intelligence Scale for Children—Fourth Edition (WISC-IV) to test cognitive abilities. D.M.'s full scale IQ was measured to be 100, which placed him in the average range. In verbal comprehension, perceptual reasoning, working memory, and processing speed, D.M. likewise scored in the average range. (Tr. 108-09.) It was observed, however, that D.M.

> frequently displayed off task behavior during the testing. He was very interested in the things in the testing room and was reminded frequently to look at the test materials or at the examiner. When verbal responses were required, [D.M.] at times gave rambling responses including off topic stories and [i]nformation. When performing paper and pencil tasks or other performance tasks, [D.M.] made noises, whistled, and hummed.

(Tr. 108.)

---

[4]The entirety of this evaluation may be found in the administrative transcript at pages 89 to 110.

D.M. was also administered the Weschler Individual Achievement Test—Second Edition (WIAT-II) to test academic abilities. D.M. was able to sound out most one-syllable words, as well as two- and three-syllable words. For reading comprehension, D.M. was able to read all target words and answer basic questions, but D.M.'s speed of reading was noted to be below average to average. On the pseudoword decoding sub-test, D.M. scored at a fifth grade level. On the written expression sub-test, D.M. was unable to put sentences together correctly; unable to write a complete sentence using organized thoughts or correct punctuation; and unable to use examples in a paragraph, stay on topic, or follow a logical sequence of events. On the listening comprehension sub-test, D.M. scored at a second grade level. With respect to numerical operations and math reasoning, D.M. was able to add and subtract basic math facts and multiple digits when no regrouping was required. D.M. was able to solve problems using patterns, comparing and ordering events, whole numbers, and quantities less than a whole. D.M. was also able to solve problems using money. D.M. was unable to solve problems using probability, multiplication or division, or units of measure. (Tr. 100-02.)

On the Behavior Evaluation Scale—3 (BES-3), D.M. scored in the average range in the areas of Interpersonal Difficulties and Physical Symptoms/Fear. The areas of Learning Problems, Inappropriate Behavior, and Unhappiness/Depression were noted to be

areas of serious concern. D.M.'s Behavior Quotient measured over one standard deviation below the mean, which D.M.'s teachers considered to be below average. (Tr. 102-03.) D.M.'s teachers noted specifically that D.M. engaged in the following behaviors on a daily basis:

- Does not follow directions, written or verbal, related to academic tasks
- Has difficulty organizing or appropriately using necessary work materials
- Refuses or fails to complete class assignments or homework
- Demonstrates difficulty or reluctance in beginning tasks
- Avoids interaction with other students or teachers
- Demonstrates inappropriate physical or verbal responses to other students' or teachers' attempts to interact
- Fails to consider or disregards consequences of own behavior
- Acts impulsively without apparent self-control
- Exhibits off-task behaviors
- Continues to engage in a behavior when it is no longer appropriate
- Talks at inappropriate times or makes irrelevant comments
- Indicates that he is not happy through verbal expression
- Fails to participate in or demonstrate an interest in special events or interesting activities

(Tr. 103-04.)

In a Statement of Categorical Disabilities, it was noted that D.M. met the eligibility criteria for a "Sound System Disorder" in the area of articulation. It was noted that, with the disorder, D.M.'s speech was generally understood ninety percent of

the time in conversational speech, but that he consistently misarticulated certain blends in speech. (Tr. 110.) Finally, it was noted that D.M. had been diagnosed by Dr. Assi as having ADHD. (Tr. 106.)

Upon review of all of the above-noted evaluations, as well as observations made by classroom teachers (Tr. 104-05), it was determined that D.M. met the eligibility criteria to be diagnosed as "Other Health Impaired" and "Sounds Systems Disorder in the area of articulation," thus making D.M. eligible to receive special education services. (Tr. 105-06.) An IEP was prepared with emphasis on improvement in speech articulation, as well as improvement in focus, completing assignments, classroom participation, and academic achievement. Testing accommodations were also included in this IEP. (Tr. 89-98.) It was determined that D.M. would receive 300 minutes per week of special education services in the area of task completion, and that D.M. would be removed from the regular classroom for such instruction. (Tr. 294, 295.) Modifications and accommodations were also implemented in the areas of lectures, tests/exams, environment, and assignments. (Tr. 297-98.)

On May 23, 2007, an amendment to D.M.'s IEP provided that, for the 2007-08 school year, D.M. would receive "CWC services" in the regular classroom to assist D.M. in completing tasks. It was noted that D.M. was already removed from the regular

classroom sixty minutes each week for speech/language therapy.
(Tr. 84-88.)

In a Teacher Questionnaire completed August 29, 2007,
D.M.'s third grade teacher, Jill Plymale, reported that while in
the third grade, D.M. performed at the third grade level in math,
reading, and written language.  Ms. Plymale reported that D.M.
received thirty minutes of special education services daily for
task completion.  Ms. Plymale reported that absenteeism was not a
problem for D.M.  (Tr. 133-40.)  Ms. Plymale reported that she
observed D.M. to have no problems in the area of Acquiring and
Using Information, nor in the area of Moving About and Manipulating
Objects.  (Tr. 134, 137.)  Ms. Plymale reported D.M. to have
obvious to serious problems in the area of Attending and Completing
Tasks, with such problems occurring on a daily basis and, in some
instances, on an hourly basis.  Ms. Plymale reported that D.M.
received extra help in this area, including:

> help organizing all school supplies, texts,
> paper, tools; call name to help get on task;
> recess time to complete work; folder to
> complete work; work sent home for completion;
> partner to do work with student; another
> classroom to complete work; separate place in
> classroom to complete work; principal's office
> to complete work; resource room to complete
> work; checklist to organize work; folder
> home/teacher daily.

(Tr. 135.)

Ms. Plymale also reported that D.M. had serious to very serious problems in the area of Interacting and Relating with Others, with such problems occurring mostly on a daily basis. Ms. Plymale reported that behavior modification strategies had been implemented, including: "quiet classroom to work; another classroom to work; resource room to work; principal's office to work; separated place in classroom; special seating; special place in line." (Tr. 136.) Ms. Plymale reported that D.M. needed extra help and support to get started on tasks. Ms. Plymale reported that she was able to understand D.M.'s speech almost all of the time when the topic of the conversation was known, and about one-half to two-thirds of the time when the topic of the conversation was unknown. (Tr. 136-37.) Ms. Plymale reported D.M. to have slight to serious problems in the area of Caring for Himself, with such problems occurring mostly weekly and/or daily. (Tr. 138.) Ms. Plymale reported that medication was not prescribed for D.M. In summary, Ms. Plymale reported the following regarding D.M.:

> Doesn't seem aware of others in the room (loner). Wasn't aware of boundaries on playground or space to line up. It took an unusually long time for him to assimilate that information. At the end of the year there was more concern about relations with others [and] regarding outbursts of anger over meanial [sic] tasks.

(Tr. 139.)

In August and September 2007, consultants with disability

determinations completed a Childhood Disability Evaluation Form in which they opined that D.M.'s impairments of ADD (Attention Deficit Disorder), esotropia, amblyopia, and astigmatism were severe but did not meet, medically equal, or functionally equal a listed impairment. With respect to functional equivalence, the consultants opined that D.M. had no limitations in the domains of Acquiring and Using Information, or Moving About and Manipulating Objects. The consultants opined that D.M. had less than marked limitations in the domains of Attending and Completing Tasks, Caring for Himself, and Health and Physical Well-Being. Finally, the consultants opined that D.M. had marked limitations in the domain of Interacting and Relating with Others. (Tr. 368-72.)

D.M. was examined by the Missouri Department of Social Services, Division of Medical Services, on September 28, 2007. D.M. was there for a check up regarding his history of ADD. It was noted that D.M. had previously taken Adderall but had not taken medication for one year and was currently taking no medications. (Tr. 374.) Referral was made to a psychiatrist for evaluation and treatment. (Tr. 375.)

On September 28, 2007, D.M. was dismissed from speech therapy services inasmuch as D.M.'s "speech error [did] not impact[] listener perception or educational perception at [that] time." (Tr. 212.)

D.M. received the following grades for the first term of

fourth grade, ending October 19, 2007: a D in Mathematics; a C- in Spelling; C+'s in Communication Arts, Science, and Reading; a "satisfactory" in Computer, Music, and Physical Education; an "excellent" in Art; and an "unsatisfactory" in Handwriting. During this term, D.M. recorded no absences from school, nor was D.M. tardy to school on any occasion. (Tr. 213.)

On November 8, 2007, D.M. visited Dr. Musa Modad and family nurse practitioner Kelly Vago at Patients First Health Care for evaluation relating to ADHD. It was noted that D.M. had been prescribed Adderall in the past and did well on the medication, but that he had been off of the medication since he moved from Florida one year prior. It was noted that D.M. was placed in a regular classroom at school and was not doing well. Dr. Modad diagnosed D.M. with ADHD and weight gain. D.M. weighed 108 pounds. Adderall[5] was prescribed, and laboratory tests were ordered and performed. (Tr. 386-89.)

D.M. returned to Dr. Modad on December 6, 2007, for follow up. It was noted that D.M. had been taking Adderall for one month and was doing better, but that he was becoming restless by the end of the school day. It noted that D.M. had no difficulty with sleep and no problems with his appetite. D.M. weighed 105 pounds. Plaintiff was instructed to increase D.M.'s

_____

[5]Adderall is a combination of dextroamphetamine and amphetamine and is used as part of a treatment program to control symptoms of ADHD. Medline Plus (last revised Aug. 1, 2010)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601234.html>.

dosage of Adderall.  (Tr. 385.)

On January 23, 2008, Michelle Merseal, D.M.'s classroom teacher, completed a Teacher Questionnaire for disability determinations.  Ms. Merseal reported that she currently taught D.M. all subjects in the fourth grade and that D.M. was at the fourth grade level in math and reading, and had a standard score of 85 in written language.  (Tr. 157.)  Ms. Merseal reported D.M. to have slight or serious problems in the area of Acquiring and Using Information and stated that D.M. could perform very well in class if he took his medication.  (Tr. 158.)  Ms. Merseal reported D.M. to primarily have obvious, serious, and very serious problems in the area of Attending and Completing Tasks, with such problems occurring on a weekly and/or daily basis.  (Tr. 159.)  With respect to Interacting and Relating with Others, Ms. Merseal reported that D.M. had serious problems playing cooperatively with other children and seeking attention appropriately, and very serious problems making and keeping friends and expressing anger appropriately.  Ms. Merseal reported these problems to occur on a daily basis.  Ms. Merseal stated that D.M. whined a lot and liked to play with the computer or paper, and that D.M. must "pull a card" when he engages in these behaviors.  Ms. Merseal also stated that D.M. received a lot of help organizing himself and received many reminders to stay on task.  (Tr. 160.)  Ms. Merseal reported that she can understand almost all of D.M.'s speech regardless of whether the topic is

known or unknown. Ms. Merseal reported that D.M. had no problems in the area of Moving About and Manipulating Objects. (Tr. 161.) In the area of Caring for Himself, Ms. Merseal reported that D.M. had serious problems in handling frustration appropriately and in using appropriate coping skills to meet daily demands of the school environment. Otherwise, Ms. Merseal reported D.M. to primarily have slight to obvious problems in this area. (Tr. 162.) Ms. Merseal reported that D.M. took prescribed medication for his condition, and that D.M.'s functioning changes after taking medication. Ms. Merseal reported that D.M. did not frequently miss school because of illness. (Tr. 163.)

D.M. returned to Dr. Modad and Nurse Vago on February 5, 2008, to obtain refills of Adderall. It was noted that D.M. had missed taking his medication for a couple of days. D.M.'s prescription for Adderall was refilled, and plaintiff was instructed to return with D.M. for follow up in four weeks. (Tr. 384.)

On February 20, 2008, Nurse Vago and Dr. Modad jointly completed a Childhood Disability Evaluation Form in which they opined that D.M.'s impairments of ADHD and legal blindness functionally equaled the listings of impairments. (Tr. 376-81.) Nurse Vago and Dr. Modad opined that D.M. had no limitations in the domain of Moving About and Manipulating Objects and less than marked limitations in the domain of Acquiring and Using

Information.  They also opined that D.M. had marked limitations in the domain of Attending and Completing Tasks, noting specifically that someone had to "stay on him to get task completed" (Tr. 378); in the domain of Interacting and Relating with Others, noting specifically that D.M. "does well with adults but not as well with children," and that "[h]e tends to talk a lot and not listen well" (id.); and in the domain of Health and Physical Well-Being, noting specifically that D.M. was "legally blind" but "otherwise healthy" (Tr. 379).  Finally, Nurse Vago and Dr. Modad opined that D.M. had extreme limitations in the domain of Caring for Himself, noting specifically that D.M. must be given continuous encouragement to get dressed and brush his teeth, and "does not match things" even if picked out by his mother.  (Id.)

D.M. visited Nurse Vago on May 5, 2008, for refills of his medication.  It was noted that D.M. was doing well with the Adderall, and that he had experienced improved grades and attentiveness with the medication.  Plaintiff reported, however, that D.M. had been out of his medication for four days and had become very disruptive in class.  No visual problems or problems with appetite were noted.  Physical examination was unremarkable. D.M.'s mood was noted to be normal.  Per Dr. Modad, D.M. was given a refill of Adderall, and plaintiff was instructed to return with D.M. in two months for follow up.  (Tr. 397.)

D.M. returned to Dr. Modad on July 29, 2008, with complaints of having trouble breathing. Dr. Modad diagnosed D.M. with allergies and asthma. Singulair and Albuterol inhaler were prescribed. (Tr. 396.)

D.M. returned to Dr. Modad on August 9, 2008, for a refill of his Adderall. Physical examination showed normal growth. D.M. weighed 116 pounds. (Tr. 394-95.)

Between September and November 2008, while D.M. was in the fifth grade, D.M. underwent IEP re-evaluation for Crawford County R-II Schools. (Tr. 227-243.) The results of D.M.'s 2006 evaluation from the St. Clair R-XIII School District were noted. It was determined that evaluation was unnecessary regarding D.M.'s general health, vision, hearing, or motor skills. (Tr. 228-29.) With respect to communication, it was noted that D.M.'s language skills were adequate and that D.M. had met his speech goals on September 28, 2007. With respect to his cognitive ability, it was noted that D.M. was in the high average range, with a verbal IQ of 95, a nonverbal IQ of 135, and full scale IQ of 113.[6] No re-evaluation was deemed necessary for D.M.'s academic performance or social/emotional behaviors. (Tr. 229.)

Observations made by D.M.'s fifth grade teachers as a part of this re-evaluation showed deficits of basic psychological processing in the areas of reading comprehension, mathematics

---

[6]See post at p. 26.

reasoning, listening comprehension, and oral expression. (Tr. 230-31.) Disturbances of speech, language-cognitive development, and nonverbal communication were shown by abnormalities that extended beyond speech to many aspects of the communication process. It was noted that D.M. had deficits in his capacity to form relationships with people and abnormalities in relating to people, events, or objects. It was concluded that D.M.'s learning disability adversely affected his school functioning:

> [D.M.'s] identified difficulties in the area of Expressive Language have resulted in a high degree of frustration (as noted in the behavioral observation). [D.M.'s] deficits in Expressive Language have been observed by the classroom teacher for 4 months and are estimated to occur frequently. Peers in this classroom had minimal difficulty in acquiring concepts presented to date. [D.M.] is working approximately 1 grade level below classmates. These problems are judged to be significant to [D.M.'s] academic achievement, are not temporary in nature and are not correctable without special education (and related services).

(Tr. 232.)

It was also noted that a significant discrepancy existed between D.M.'s achievement and ability, with a discrepancy of at least 1.5 standard deviations. (Tr. 232.) The evaluation team determined that such discrepancy was not primarily caused by mental retardation, visual or auditory acuity deficits or motor deficits, behavioral disorders or emotional disturbances, environmental or

economic disadvantages, cultural differences, lack of instruction in reading or math, dialectical differences, or limited English proficiency. (Tr. 233.)

For purposes of this IEP re-evaluation, D.M. underwent a psychological evaluation on October 15, 2008. Dr. Martin Rosso noted D.M. to be presently taking Adderall for a diagnosed condition of ADHD. Dr. Rosso administered the Reynolds Intellectual Assessment Scales which showed a verbal IQ of 95, a nonverbal IQ of 135, and full scale IQ of 113, which placed D.M. in the high average range of general intelligence. Results from the Integrated Visual and Auditory Continuous Performance Test indicated concerns with impulsiveness, as well as with sustained attention and focus. D.M.'s scores obtained on the Behavior Assessment System for Children were significant for depression, anxiety and adaptability. On the Gilliam Asperger's Disorder Scale, D.M.'s scaled score placed him in the high probability range for a diagnosis of Asperger's Syndrome. Upon conclusion of the evaluation, Dr. Rosso diagnosed D.M. with ADHD—combined type, and Asperger's Syndrome. It was recommended that D.M. maintain a relationship with a physician concerning medication for ADHD, undergo social skills training if D.M. demonstrated social deficits at school, and engage in various strategies to help with studying. (Tr. 234-42.)

As a result of the IEP re-evaluation, a new IEP was

implemented for D.M. on November 5, 2008, with D.M.'s primary disability noted to be Asperger's Autism.  (Tr. 306-23.)  D.M.'s current performance was described as follows:

> [D.M.] meets the state and local criteria to be classified as having Aspergers Autism.  He has a diagnosis of ADHD, and is currently on medication for his ADHD.  When [D.M.] takes his medication, he is able to stay on task and complete his class work correctly.  [D.M.] wears grasses [sic] and has difficulty seeing without them. [D.M.'s] disability affects his involvement and progress in the general education curriculum due to his inability to stay focused during instruction.  [D.M.] also has difficulty with social interaction with peers and adults. As needed, [D.M.] benefits from small group instruction, help staying on task, organizing materials and completing assignments.

(Tr. 309.)

Goals were made and strategies were identified in the IEP, with accommodations provided for testing.  (Tr. 311-14, 317-20.)  The IEP team determined that D.M. would be placed in a regular classroom forty to seventy-nine percent of the time, with D.M. receiving special education services in the areas of study skills and math, as well para-educator services in the classroom.  (Tr. 306, 314.)

D.M. visited Dr. Modad on November 13, 2008, who noted D.M.'s ADHD to be stable.  It was noted that D.M. was doing well in school.  It was also noted that D.M. had a good appetite and was sleeping well.  D.M. weighed 111 pounds.  D.M.'s prescription for

Adderall was refilled.  (Tr. 392-93.)

On November 23, 2008, D.M. received a one-day in-school suspension for spitting on another student.  (Tr. 305.)

D.M. returned to Dr. Modad and Nurse Vago on February 9, 2009.  It was noted that D.M. continued to have difficulty with focusing and that, despite dosages of medication throughout the day, D.M. still had poor attention.  A new prescription for Adderall was written.  D.M. weighed 113 pounds.  (Tr. 391.)

In a letter dated April 6, 2009, D.M.'s babysitter and godmother, Julie Fischer, wrote that D.M. does not listen, lacks focus, is "all over the place," and will not sit still.  Ms. Fischer wrote that it takes D.M. hours to perform simple chores. Ms. Fischer also wrote that D.M. is aggressive and tries to "get into your face" in order to have your full attention when he is talking to you.  Ms. Fischer wrote that D.M. has problems dressing himself and fights over maintaining his personal hygiene.  Ms. Fischer wrote that D.M. has been displaying more responsibility by taking care of his glasses, and that he loves to ride his bike and call his friend and talk on the telephone.  Ms. Fischer also wrote that D.M. will talk to anyone and "knows no strangers[.]"  (Tr. 245.)

On April 20, 2009, D.M.'s fifth grade teachers wrote the following letter To Whom it May Concern:

[D.M.] has been a student in our 5th grade

classes during the 2008-09 school year. He is a bright student who enjoys reading. He likes to discuss the books he is reading, especially with the teacher. He is also very capable of 5th grade level work. He is a creative thinker and enjoys working on hands-on projects.

Often [D.M.] prefers to read when he is expected to work. Several times we have had to take his book away so that he will engage in the classroom activity and begin working on his own assignments. He becomes agitated when you take away his book or make him lose his place.

[D.M.] prefers to work alone. When in a group situation or when working on a group project, he is very uncooperative. He does not participate with the group or work well with others. He has difficulty collaborating and compromising with his peers. Often he will wear his large winter coat and put it over his head to remove himself from the situation.

[D.M.] rarely comes to class prepared. He would like to leave class to return to his locker or wander from class to class looking for his lost supplies. He has difficulty focusing on what he needs to have or what he needs to be doing. He will space out when he is supposed to be working.

(Tr. 252.)

D.M.'s grades for the first semester of fifth grade, ending December 19, 2008, included A's in Science and Physical Education, an A- in Math, a B+ in Social Studies, a B in Reading, and a B- in Language. D.M. received a grade of "satisfactory" in Study Skills. D.M. was on the Honor Roll for the semester. During the first semester, D.M. was absent from school on two occasions,

and tardy to school on five occasions. (Tr. 253.) D.M.'s grades for the first term of second semester, ending March 11, 2009, included an A- in Reading and Social Studies; a B+ in Math; B's in Science, Language, and Music; and a B- in Health. D.M. received a grade of "satisfactory" in Study Skills. D.M. remained on the Honor Roll for the term. During this term, D.M. was absent from school on three occasions, and tardy to school on two occasions. (Tr. 256.)

On April 9, 2009, D.M. received a detention notice in Science: "[D.M.] did not work during class today — many reminders — had nothing to turn in at the end of class." (Tr. 268.)

In an undated script from Patients First Health Care, Nurse Vago wrote that plaintiff needed to "work from home due to caring full time for her autistic child who also has aggressive behavior." (Tr. 351.)[7]

### IV. The ALJ's Decision

The ALJ found D.M. not to have engaged in substantial gainful activity at any time relevant to the decision. The ALJ found D.M.'s combined impairments of ADHD, Asperger's Syndrome, and visual disturbances to be severe, but not to meet or medically equal the severity of any impairment in the Listings of Impairments. The ALJ also found D.M.'s impairments or combination

---

[7]In a letter to the Appeals Council, counsel for plaintiff avers that this script was written around or about July 2009. (Tr. 350.)

of impairments not to functionally equal the Listings.  The ALJ thus determined D.M. not to have been disabled at any time since the filing of the application, that is, July 30, 2007.  (Tr. 17-28.)

## V.  Discussion

A claimant under the age of eighteen is considered disabled and eligible for Supplemental Security Income (SSI) under the Social Security Act if he "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 1382c(a)(3)(C)(i).

The Commissioner is required to undergo a three-step sequential evaluation process when determining whether a child is entitled to SSI benefits.  First, the Commissioner must determine whether the child is engaged in substantial gainful activity.  If not, the Commissioner must then determine whether the child's impairment, or combination of impairments, is severe.  Finally, if the child's impairment(s) is severe, the Commissioner must determine whether such impairment(s) meets, medically equals or functionally equals the severity of an impairment listed in Appendix 1 of Subpart P of Part 404 of the Regulations.  20 C.F.R. § 416.924(a); <u>Garrett ex rel. Moore v. Barnhart</u>, 366 F.3d 643, 647

(8th Cir. 2004). If the impairment(s) meets or medically equals a Listing, the child is disabled. <u>Garrett</u>, 366 F.3d at 647. If a child's impairment does not meet or medically equal a listed impairment, the Commissioner will assess all functional limitations caused by the child's impairment to determine whether the impairment functionally equals the Listings. 20 C.F.R. § 416.926a. To functionally equal a listed impairment, the child's condition must result in an "extreme" limitation of functioning in one broad area of functioning, or "marked" limitations of functioning in two broad areas of functioning. 20 C.F.R. § 416.926a(a). If this analysis shows the child not to have an impairment which is functionally equal in severity to a listed impairment, the ALJ must find the child not disabled. <u>Oberts o/b/o Oberts v. Halter</u>, 134 F. Supp. 2d 1074, 1082 (E.D. Mo. 2001).

The Commissioner's findings are conclusive upon this Court if they are supported by substantial evidence. 42 U.S.C. § 405(g); <u>Young v. Shalala</u>, 52 F.3d 200 (8th Cir. 1995) (citing <u>Woolf v. Shalala</u>, 3 F.3d 1210, 1213 (8th Cir. 1993)). Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion. <u>Briggs v. Callahan</u>, 139 F.3d 606, 608 (8th Cir. 1998). In evaluating the substantiality of the evidence, the Court must consider evidence which supports the Commissioner's decision as well as any evidence which fairly detracts from the decision. <u>Id.</u> Where substantial

evidence supports the Commissioner's decision, the decision may not be reversed merely because substantial evidence may support a different outcome.  Id.

Plaintiff claims that the ALJ's decision is not supported by substantial evidence on the record as a whole.  The plaintiff raises no issue relating to the ALJ's determination that D.M.'s impairments do not meet or medically equal a listed impairment, but she argues that the ALJ erred in his determination that D.M.'s impairments do not functionally equal a listed impairment inasmuch as the evidence supports a finding that D.M. suffers marked limitations in two domains of functioning or an extreme limitation in one.  Plaintiff also contends that the ALJ erred by according significant weight to the non-examining consultants' opinions rendered in August and September 2007.  Finally, plaintiff argues that the ALJ erred in his adverse credibility determination.

A.    Functional Equivalence

As set out above, when a child's severe impairments are determined not to meet or medically equal a Listing, the Commissioner is required to determine whether and to what extent the child's impairments affect broad areas of functioning as defined by the Regulations, and thus whether such impairments functionally equal a Listing.  To "functionally equal the Listings," the impairment must be of Listing-level severity, i.e., it must result in "marked" limitations in two domains of

functioning, or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a(a). The domains are "broad areas of functioning intended to capture all of what a child can or cannot do." 20 C.F.R. § 416.926a(b)(1). The six domains used by the Commissioner in making such a determination are: 1) Acquiring and Using Information; 2) Attending and Completing Tasks; 3) Interacting and Relating with Others; 4) Moving About and Manipulating Objects; 5) Caring for Oneself; and 6) Health and Physical Well-Being. Id. As such, to be determined disabled, a child-claimant must have an "extreme" limitation in one domain or a "marked" limitation in two domains. 20 C.F.R. § 416.926a(a).

Under the Social Security Regulations, a child-claimant has a "marked" limitation in a domain when his

> impairment(s) interferes seriously with [his] ability to independently initiate, sustain, or complete activities. [His] day-to-day functioning may be seriously limited when [his] impairment(s) limits only one activity or when the interactive and cumulative effects of [his] impairment(s) limit several activities. "Marked" limitation also means a limitation that is "more than moderate" but "less than extreme."

20 C.F.R. § 416.926a(e)(2)(i).

A child will be found to have an "extreme" limitation when the impairment "interferes very seriously with [the child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3). In determining whether a child-claimant's

functioning may be marked or extreme, the Commissioner is to review all the evidence of record and "compare [the child's] functioning to the typical functioning of children [the child's] age who do not have impairments." 20 C.F.R. § 416.926a(f)(1); see also 20 C.F.R. § 416.926a(b) (in determining child-claimant's functioning, Commissioner looks "at how appropriately, effectively and independently [the child] perform[s] [his] activities compared to the performance of other children [the child's] age who do not have impairments."); 20 C.F.R. § 416.924a(b)(5). For children who have spent time in structured or supportive settings, such as special classrooms or residential facilities, the Commissioner is to consider whether and to what extent such structured setting affects the child's functional limitations and how the child would function outside of such setting. 20 C.F.R. § 416.924a(b)(5)(iv).

A review of the ALJ's decision in this cause shows the ALJ to have summarized the evidence of record and conclude that D.M. suffered less than marked limitations in the domains of Attending and Completing Tasks, Interacting and Relating with Others, Caring for Oneself, and Health and Physical Well-Being. The ALJ found D.M. to have no limitations in the domains of Acquiring and Using Information, and Moving About and Manipulating Objects. While plaintiff does not dispute the ALJ's findings with respect to the domain of Moving About and Manipulating Objects, plaintiff contends that substantial evidence demonstrates D.M. to

suffer marked limitations in the domains of Acquiring and Using Information, and Attending and Completing Tasks; and marked to severe limitations in the domains of Interacting and Relating with Others, and Caring for Oneself. Finally, with respect to the domain of Health and Physical Well-Being, plaintiff contends that the ALJ failed to consider that D.M. was overweight, legally blind, and took medication for ADHD. For the following reasons, the ALJ's decision regarding D.M.'s level of functioning in each domain is supported by substantial evidence.

1.  *Acquiring and Using Information*

For the domain of Acquiring and Using Information, the Commissioner is to consider "how well [the child] acquires and learns information, and how well [the child] uses information learned." 20 C.F.R. § 416.926a(g).

> Thinking is the application or use of information you have learned. It involves being able to perceive relationships, reason, and make logical choices. . . . You must also be able to use language to think about the world and to understand others and express yourself; e.g., to follow directions, ask for information, or explain something.

20 C.F.R. § 416.926a(g)(1)(ii).

The Regulations provide that school-age children between the ages of six and twelve should be able to

> learn to read, write, and do math, and discuss history and science. You will need to use

these skills in academic situations to demonstrate what you have learned; e.g., by reading about various subjects and producing oral and written projects, solving mathematical problems, taking achievement tests, doing group work, and entering into class discussions. You will also need to use these skills in daily living situations at home and in the community (e.g., reading street signs, telling time, and making change). You should be able to use increasingly complex language (vocabulary and grammar) to share information and ideas with individuals or groups, by asking questions and expressing your own ideas, and by understanding and responding to the opinions of others.

20 C.F.R. § 416.926a(g)(2)(iv).

In this cause, the ALJ determined D.M. to have no limitations in this domain. The ALJ specifically noted that D.M.'s IQ scores consistently placed him in the average to above average range of intelligence, and that D.M. consistently received grades of A's and B's with limited instruction outside the regular classroom. Indeed, a review of the record shows D.M.'s instruction outside the regular classroom to consist primarily of speech/language therapy and task completion as opposed to remedial teaching of core subjects. The undersigned also notes D.M.'s teachers to have reported that D.M. enjoyed working on projects, enjoyed sharing information in classroom discussions, liked to discuss books, was a creative thinker, and was capable of performing grade level work. Early testing likewise showed D.M. able to perform math problems using money. Although the teachers

reported some limitations, including uncooperativeness in group settings, there nevertheless is substantial evidence on the record as a whole to support the ALJ's conclusion that such difficulties do not rise to a level to be considered "marked" limitations under the Regulations. See Neal ex rel. Walker v. Barnhart, 405 F.3d 685, 688 (8th Cir. 2005) (may not reverse merely because substantial evidence may support different outcome).

2. *Attending and Completing Tasks*

For this domain, the Commissioner is to consider how well the child is able to focus and maintain his attention, and how well the child can begin, carry through, and finish his activities, including the pace at which he performs activities and the ease with which he changes them. 20 C.F.R. § 416.926a(h).

> Attention involves regulating your levels of alertness and initiating and maintaining concentration. It involves the ability to filter out distractions and to remain focused on an activity or task at a consistent level of performance. This means focusing long enough to initiate and complete an activity or task, and changing focus once it is completed. It also means that if you lose or change your focus in the middle of a task, you are able to return to the task without other people having to remind you frequently to finish it.

20 C.F.R. § 416.926a(h)(1)(i).

The Regulations provide that school-age children should be able to

> focus your attention in a variety of situations in order to follow directions,

remember and organize your school materials, and complete classroom and homework assignments. You should be able to concentrate on details and not make careless mistakes in your work . . . . You should be able to change your activities or routines without distracting yourself or others, and stay on task and in place when appropriate. You should be able to sustain your attention well enough to participate in group sports, read by yourself, and complete family chores. You should also be able to complete a transition task (e.g., be ready for the school bus, change clothes after gym, change classrooms) without extra reminders and accommodation.

20 C.F.R. § 416.926a(h)(2)(iv).

In this cause, the ALJ determined D.M. to have less than marked limitations in this domain. The ALJ specifically noted that D.M.'s "ability to consistently earn above average grades demonstrates that he is generally capable of attending and completing tasks assigned to him by his teachers." (Tr. 24.) The undersigned also notes that D.M. had few occurrences of tardiness to school and no reports of missing or skipping classes while at school, which demonstrates an ability to complete transition tasks. The record shows that D.M. likes to read and is fully capable of reading by himself and, indeed, prefers such activity. Although the record shows D.M. to experience some limitations in this domain in that D.M. often requires reminders and encouragement to stay on task, the evidence also shows that D.M.'s focus and task completion improves when he takes his medication. See Pepper ex rel. Gardner

v. Barnhart, 342 F.3d 853, 855-56 (8th Cir. 2003) (no more than a moderate limitation where school records show child capable of doing work and that overall condition is improving). Accordingly, upon review of the record as a whole, it cannot be said that the ALJ's conclusion — that D.M.'s difficulties are not such that they should be determined to be more than "less than marked" under the Regulations — is not supported by substantial evidence. See Neal ex rel. Walker, 405 F.3d at 688.

3.  *Interacting and Relating with Others*

For this domain, the Commissioner is to consider how well the child initiates and sustains emotional connections with others, develop and use the language of his community, cooperate with others, comply with rules, respond to criticism, and respect and take care of the possessions of others. 20 C.F.R. § 416.926a(i). The Regulations provide that school-age children should be able to

> develop more lasting friendships with children who are your age. You should begin to understand how to work in groups to create projects and solve problems. You should have an increasing ability to understand another's point of view and to tolerate differences. You should be well able to talk to people of all ages, to share ideas, tell stories, and to speak in a manner that both familiar and unfamiliar listeners readily understand.

20 C.F.R. § 416.926a(i)(2)(iv).

In this cause, the ALJ determined D.M. to have less than marked limitations in this domain. The ALJ specifically noted that

D.M.'s teachers reported D.M. to have one good friend and that D.M. was kind to younger children. The ALJ also noted that D.M.'s babysitter reported that D.M. enjoyed talking on the telephone with friends and was comfortable interacting with strangers. The undersigned notes the record to also show that D.M. likes to tell stories and that he speaks in a manner that can be understood. It also appears that D.M. is able to comply with rules inasmuch as the record contains only one note of disciplinary action taken on account of D.M.'s inappropriate behavior directed at another student. Although the record shows D.M. to experience some limitations in this domain in that D.M. experiences difficulty working in groups and tends to isolate himself, there nevertheless is substantial evidence on the record as a whole to support the ALJ's conclusion that such difficulties do not rise to a level to be considered "marked" limitations under the Regulations. See Neal ex rel. Walker, 405 F.3d at 688.

4. *Caring for Oneself*

For this domain, the Commissioner is to consider how well the child maintains a healthy emotional and physical state, including how well he gets his physical and emotional wants and needs met in appropriate ways; how he copes with stress and changes in his environment; and whether he takes care of his own health, possessions, and living area. 20 C.F.R. § 416.926a(k). The Regulations provide that school-age children should be

independent in most day-to-day activities
(e.g., dressing yourself, bathing yourself),
although you may still need to be reminded
sometimes to do these routinely. You should
begin to recognize that you are competent in
doing some activities and that you have
difficulty with others. You should be able to
identify those circumstances when you feel
good about yourself and when you feel bad.
You should begin to develop understanding of
what is right and wrong, and what is
acceptable and unacceptable behavior. You
should begin to demonstrate consistent control
over your behavior, and you should be able to
avoid behaviors that are unsafe or otherwise
not good for you. You should begin to imitate
more of the behavior of adults you know.

20 C.F.R. § 416.926a(k)(3)(iv).


In this cause, the ALJ determined D.M. to have less than

marked limitations in this domain. The ALJ specifically noted that

D.M.'s teachers reported D.M. to demonstrate an ability to protect

himself and to look out for his own best interests, such as seeking

to go to the library when he was uncomfortable in the cafeteria.

The undersigned notes the record to also show that D.M. understands

right from wrong, as evidenced by his mother's testimony that he

knows he cannot hit and also by his disciplinary record at school

which shows only one disciplinary action for acting out against

another student. Such evidence demonstrates that D.M. appears to

exhibit consistent control over his behavior. In addition, the

record also shows that D.M. is independent in activities such as

dressing himself and caring for his personal hygiene. Although he

- 42 -

demonstrates frustration and reluctance in doing such activities and needs to be reminded sometimes to do them routinely, the record nevertheless shows D.M.'s capability. Finally, the undersigned notes that in April 2009, D.M.'s babysitter reported that D.M. was showing responsibility with his possessions and was taking good care of his glasses. As such, a review of the record as a whole shows there to be substantial evidence to support the ALJ's conclusion that any difficulties experienced by D.M. in the domain of Caring for Oneself are not such that they should be determined to be more than "less than marked" under the Regulations. See Neal ex rel. Walker, 405 F.3d at 688.

5.  *Health and Physical Well-Being*

In this domain, the Commissioner is to consider "the cumulative physical effects of physical or mental impairments and their associated treatments or therapies on [the child's] functioning that [was] not consider[ed] in" the domain of Moving About and Manipulating Objects.[8]   20 C.F.R. § 416.926a(l). Examples of limitations in this domain include generalized symptoms such as weakness, dizziness, agitation, lethargy, or psychomotor retardation; somatic complaints relating to impairments;

---

[8]In the domain of Moving About and Manipulating Objects, the ALJ found D.M. not to have any limitations:  "The claimant has no limitation in moving about and manipulating objects.  All of the claimant's teachers and doctors agree that he has no limitations in this domain."  (Tr. 26.)  Plaintiff does not challenge this finding.

limitations in physical functioning due to treatment; exacerbations of impairments that interfere with physical functioning; or medical fragility with a need for intensive medical care to maintain a level of health and physical well-being. 20 C.F.R. § 416.926a(l)(4).

In this cause, the ALJ determined D.M. to have less than marked limitations in this domain. The ALJ specifically noted that D.M.'s teachers and doctors indicated that D.M. was generally in good health and experienced no limitations or less than marked limitations in this domain. The ALJ noted that Dr. Modad's conclusory remark that D.M. was legally blind was inconsistent the medical evidence of record demonstrating otherwise and was contrary to D.M.'s teachers' reports that D.M.'s vision was adequate when he wears his glasses. The undersigned also notes that D.M.'s physical agitation, or fidgetiness, appears to be adequately remedied with medication and appropriate adjustments thereto. Indeed, D.M.'s teachers report improvement when D.M. takes his medication. Finally, to the extent plaintiff claims that the ALJ failed to consider that D.M.'s weight of 130 pounds renders him overweight, the undersigned notes there to be no medical evidence in the record showing D.M. to weigh 130 pounds or that D.M. was ever considered to be overweight. Indeed, in February 2009 (two months prior to the hearing), D.M. weighed 113 pounds; and in August 2008, when D.M. weighed 111 pounds, Dr. Modad noted D.M.'s physical growth to

be normal.  As such, a review of the record as a whole shows there to be substantial evidence to support the ALJ's conclusion that any difficulties experienced by D.M. in the domain of Health and Physical Well-Being are not such that they should be determined to be more than "less than marked" under the Regulations.  See Neal ex rel. Walker, 405 F.3d at 688.

In light of the above, there is substantial evidence on the record as a whole to support the ALJ's conclusion that, to the extent D.M.'s medically established impairment(s) result in any functional limitations in the domains of Acquiring and Using Information, Attending to and Completing Tasks, Interacting and Relating with Others, Caring for Oneself, and Health and Physical Well-Being, such limitations are not of such a degree so as to be considered "marked" or "extreme" limitations under the Regulations.

B.    Weight Accorded to Medical Opinions

Plaintiff contends that the ALJ erred by according significant weight to the non-examining consultants' opinions rendered in August and September 2007, and by disregarding the February 2008 opinion of D.M.'s treating physician.

The Regulations require the Commissioner to give more weight to the opinions of treating physicians than other sources.  20 C.F.R. § 416.927(d)(2).  A treating physician's assessment of the nature and severity of a claimant's impairments should be given controlling weight if the opinion is well supported by medically

acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. 20 C.F.R. § 416.927(d)(2); see also Forehand v. Barnhart, 364 F.3d 984, 986 (8th Cir. 2004). This is so because a treating physician has the best opportunity to observe and evaluate a claimant's condition,

> since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. § 416.927(d)(2).

Opinions of treating physicians do not automatically control in determining disability, however, inasmuch as the Commissioner is required to evaluate the record as a whole. Wagner v. Astrue, 499 F.3d 842, 849 (8th Cir. 2007); Charles v. Barnhart, 375 F.3d 777, 783 (8th Cir. 2004). The ALJ may discount or disregard such opinions if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions. Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001).

When a treating physician's opinion is not given controlling weight, the Commissioner must look to various factors

in determining what weight to accord the opinion, with such factors including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, whether the treating physician provides support for his findings, whether other evidence in the record is consistent with the treating physician's findings, and the treating physician's area of specialty.  20 C.F.R. § 416.927(d)(2).  The Regulations further provide that the Commissioner "will always give good reasons in [the] notice of determination or decision for the weight [given to the] treating source's opinion."  Id. Inconsistency with other evidence alone is sufficient to discount a treating physician's opinion.  Goff v. Barnhart, 421 F.3d 785, 790-91 (8th Cir. 2005).

In this cause, the ALJ recognized Dr. Modad to be D.M.'s treating physician and noted Dr. Modad's February 2008 assessment to include findings that D.M. had marked or extreme limitations in several of the functional domains.  The ALJ determined not to give Dr. Modad's assessment significant weight, however, inasmuch as

> the reasons he cites in support of his opinion are not consistent with the level of severity he assigns to the domain and/or not consistent with the other medical evidence in the record. For example, he finds the claimant to have marked limitations in the domain of health based on being blind; however, it appears that the claimant has almost normal vision when he wears corrective glasses.

(Tr. 22.)

The ALJ's finding that Dr. Modad's assessment is inconsistent with other medical evidence in the record is supported by substantial evidence. In addition, as noted by the ALJ, Dr. Modad's descriptions of D.M.'s functioning in each domain do not describe limitations that rise to the level of "marked" or "extreme" limitations as set out in the Regulations. See discussion supra at Section V.A.

To the extent plaintiff claims that the ALJ erred by according significant weight to, and relying on, the August and September 2007 opinions of the non-examining consultants to support his adverse determination, a review of the ALJ's decision shows plaintiff's claim to be without merit. A reading of the ALJ's decision in its entirety shows the ALJ to have considered all of the evidence of record and to have based his determination on his review of the record as a whole, and not solely on the consultants' opinions as plaintiff contends. Indeed, the ALJ specifically reviewed and considered the reports and observations of D.M.'s treating and examining physicians, teachers, school evaluators, and others who saw the child often and could describe D.M.'s functioning at home. See 20 C.F.R. § 416.926a(b)(3). To the extent the consultants' opinions were consistent with such record evidence, the ALJ accorded them significant weight. This was not error.

C.    Credibility Determination

        Plaintiff claims that the ALJ erred in determining her
testimony regarding the limiting effects of D.M.'s impairments not
to be credible.

        In a child's SSI case, the ALJ must make specific
findings concerning the credibility of a parent's testimony, just
as he would if the child were testifying for himself.  See 20
C.F.R. § 416.928(a); see also Williams o/b/o Williams v. Bowen, 859
F.2d 255, 260-61 (2d Cir. 1988) (reasons must be given for
rejecting testimony in child's benefits case).  The Regulations
also provide various factors for the Commissioner to consider in
determining whether a child-claimant suffers a disability,
including the age of the child, functioning in age-appropriate
activities, activities of daily living, third-party observations,
effects of medication, effects of and adaptations to environmental
settings, school attendance, and effectiveness of treatment and
intervention.  See 20 C.F.R. §§ 416.924a and 416.924b.  Such
factors appear to mirror those set out in Polaski v. Heckler, 739
F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted), only
in the child-claimant context.[9]  Where an ALJ explicitly considers

_____

        [9]In determining the credibility of a claimant's subjective
complaints, Polaski requires the ALJ to consider all evidence
relating to the complaints, including third party observations as
to the claimant's daily activities; the duration, frequency and
intensity of the symptoms; any precipitating and aggravating
factors; the dosage, effectiveness and side effects of medication;
and any functional restrictions.  Polaski, 739 F.2d at 1322.

the Polaski factors but then discredits subjective complaints for good reason, the decision should be upheld. Hogan, 239 F.3d at 962; see also Casey v. Astrue, 503 F.3d 687, 696 (8th Cir. 2007).

In his written decision here, the ALJ set out numerous inconsistencies in the record to support his conclusion that plaintiff's testimony regarding the extent of D.M.'s limitations was not credible. Specifically, the ALJ noted that D.M.'s condition improved and that he performed well when he took his medication. See Schultz v. Astrue, 479 F.3d 979, 983 (8th Cir. 2007) (an impairment that is controllable by medication is not disabling); see also Briggs, 139 F.3d at 609 (affirming ALJ's decision that child was not disabled when her hyperactivity was controlled by medication). The ALJ also noted the record to show, however, that D.M. was inconsistent in taking his medication and went without medication for one year upon his move from Florida. See Wade for Robinson v. Callahan, 976 F.2d 1269, 1275 (E.D. Mo. 1997) (lack of ongoing treatment inconsistent with claim of disability in child-benefits case); see also Nelson v. Sullivan, 966 F.2d 363, 367 (8th Cir. 1992) (alleged disabling condition controllable but claimant failed to avail himself of treatment); Holley v. Massanari, 253 F.3d 1088, 1092 (8th Cir. 2001) (failure to comply with treatment recommendations properly considered by ALJ in credibility determination). The ALJ also noted that D.M.'s visual disorder was treated conservatively with eyeglasses and that

such treatment rendered D.M. able to see almost normally. <u>See</u> <u>Black v. Apfel</u>, 143 F.3d 383, 386 (8th Cir. 1998) (conservative treatment inconsistent with allegations of disabling impairment). The ALJ noted D.M.'s school performance to be above average, with D.M. obtaining grades of A's and B's with minimal instruction outside the regular classroom. The ALJ also noted that D.M. had one good friend at school and socialized with friends on the telephone while at home. The ALJ also noted D.M. to be open and friendly with younger children and to be able to interact with strangers.

As set out above, the ALJ considered the testimony of plaintiff in light of the relevant factors and determined the evidence not to show a child as limited as plaintiff contends. The ALJ appropriately articulated the inconsistencies upon which he relied in discrediting plaintiff's testimony of disabling limitations. Because substantial evidence in the record supports this finding, this Court must affirm the ALJ's decision in this regard. <u>See Eichelberger v. Barnhart</u>, 390 F.3d 584, 590 (8th Cir. 2004) ("We will not substitute our opinion for that of the ALJ, who is in a better position to assess credibility."); <u>Baldwin v.</u> <u>Barnhart</u>, 349 F.3d 549, 558 (8th Cir. 2003) ("The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.").

## VI.  Conclusion

The ALJ discussed all the evidence of record and determined D.M.'s impairment not to meet, medically equal or functionally equal a listed impairment, and thus that D.M.'s condition was not disabling under the Regulations.  For all of the foregoing reasons, this determination is supported by substantial evidence on the record as a whole.  Where substantial evidence supports the Commissioner's decision, the decision may not be reversed merely because substantial evidence may support a different outcome, or because another court could have decided the case differently.  Neal ex rel. Walker, 405 F.3d at 688; Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001); see also see also Flynn v. Astrue, 513 F.3d 788, 795 (8th Cir. 2008).  Because there is substantial evidence on the record as a whole to support the ALJ's decision, the Commissioner's determination that D.M. is not disabled should be affirmed.

Therefore, for all of the foregoing reasons,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **AFFIRMED** and plaintiff's Complaint is dismissed with prejudice.

Judgment shall be entered accordingly.

_Frederick R. Buckles_
_____
UNITED STATES MAGISTRATE JUDGE

Dated this  _29th_  day of March, 2011.